[Crim. No. 4982. Third Dist. June 19, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. GILBERT BALDIMAR MARTINEZ, Defendant and Appellant.

Werner K. Zimmer, under appointment by the Court of Appeal, and Paul J. Petrozzi for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Jack R. Winkler and Edward A. Hinz, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, Acting P. J.—A jury found Gilbert Martinez guilty of first degree robbery and first degree murder. He appeals from the judgment.

According to the prosecution evidence, Gilbert, together with Robert Martinez, his younger brother, and Benny Corpos, had driven into a service station in Sacramento in Corpos' Pontiac sedan and attempted to hold up James Currin, the attendant. Robert had fired a single shot at Currin after the latter had secured a .25 caliber automatic pistol and had shot in the direction of the Pontiac. Robert's single shot pierced Currin's head, fatally wounding him. The trio fled from the scene in the Pontiac pursued by a Shasta County deputy sheriff who happened to be driving by. During the chase Gilbert jumped from the Pontiac. The chase continued; both cars crashed, the Pontiac overturning. The officer covered both occupants with a pistol. Other officers found a .38 caliber revolver lying in the Pontiac. The slug which killed Currin was of the same caliber, but positive identification of the weapon was not possible. Both license plates of the Pontiac had been covered by cardboard or paper. Officers later apprehended Gilbert at his home. Gilbert's trial was severed from that of his companion.

The .25 caliber automatic used by Currin belonged to the station owner, who kept it in a desk in the station office. The pistol was in a holster, had cartridges in the clip but none in the chamber. After the shooting, the holster was found lying

on the concrete outside the station office. The automatic lay near Currin's body. Three empty .25 caliber cardridge cases and a .25 caliber slug were found nearby. Another .25 caliber slug was found inside the panel of the Pontiac's right front door. In addition to the hole in the car door made by the slug, a chrome strip on that door bore a crease or indentation.

On the night in question the station cash was kept in a single cash box located at an "island" near the station office. Although there had been $40 to $60 in the box a short while earlier, an examination after the shooting disclosed only a few coins. On the desk in the office was a crumbled paper bag holding $49.83 in bills and coins.

Robert and Gilbert were the defense witnesses. In summary, they testified: They had been drinking wine and were driving around with Benny. Robert had an Iver Johnson .38 caliber revolver and a single round of ammunition. He wanted to sell the revolver. They drove into the station, Robert to use the phone, Gilbert to use the bathroom. When the attendant saw a wine bottle in Gilbert's coatpocket, an altercation ensued. The attendant pulled a gun, ordered Gilbert to lie on the ground and fired it at him when he didn't comply. According to Gilbert, two shots were fired at him; according to Robert, only one. Gilbert then commenced to lie down. Robert had remained in the car, waiting to borrow a dime from Gilbert. The attendant walked to the front of the car and ordered Robert and Benny to get out. He was pointing his pistol at Gilbert. Thinking that the attendant was going to shoot Gilbert, Robert inserted his single bullet in the revolver, dismounted from the car and fired at Currin, who fell to the ground. The three left in the Pontiac, then noticed they were being chased. They denied any knowledge of paper or cardboard over the Pontiac's license plates.

The trial court instructed the jury on robbery, conspiracy to rob and first degree felony murder. Although his trial counsel offered no instructions on lesser degrees of homicide, defendant now contends that the trial court erred in not giving such instructions on its own motion.

This is unlike the felony-murder cases in which the defense evidence, however incredible, provided a basis for instructions on second degree murder or manslaughter. In those cases the defendant on trial had personally inflicted the mortal wound (e.g., *People* v. *Jeter*, 60 Cal.2d 671, 674-675 [36 Cal.Rptr. 323, 388 P.2d 355]; *People* v. *Lewis*, 186 Cal.App.2d 585, 596-597 [9 Cal.Rptr. 263]). A killing in the perpetration

of a robbery (or attempted robbery) is first degree murder, whether premeditated or accidental and whether or not planned as part of the robbery. (*People* v. *Lookadoo*, 66 Cal. 2d 307, 314 [57 Cal.Rptr. 608, 425 P.2d 208]; see Pen. Code, § 189.) Whichever of the robbers fired the fatal shot, both are guilty of first degree murder. (*People* v. *Chapman*, 261 Cal. App.2d 149, 165 [67 Cal.Rptr. 601].) ▆▆▆ Robert had been separately tried. Gilbert's entitlement to instructions was measured by the evidence in his own trial, not the evidence or verdict in another trial. (Cf. *People* v. *Jeter, supra*, 60 Cal.2d at p. 676.) His participation as accomplice in a robbery or attempted robbery was indispensable to his criminal liability for the shot fired by Robert. If Gilbert was Robert's accomplice in robbery, the fatal shot by Robert inculpated Gilbert in first degree murder; if he was not Robert's accomplice, he had no responsibility for the shot. There was no evidence to justify Gilbert's conviction as an accomplice to a second degree murder or manslaughter committed by Robert.

▆▆▆ Defendant attacks the evidentiary basis for the robbery verdict. He points out that whatever the evidence of attempted robbery, there is no evidence of an asportation or taking, an essential element of a completed robbery. There was, it is true, no evidence that Gilbert and his companions ever had physical possession of the service station's money. The evidence provided a reasonable inference that Currin, at gunpoint, had been forced to take the money from the cash box and place it in a paper sack. ▆▆▆ Robbery does not necessarily entail the robber's manual possession of the loot. It is sufficient if he acquired dominion over it, though the distance of movement is very small and the property is moved by a person acting under the robber's control, including the victim. (*People* v. *Burnett*, 176 Cal.App.2d 787, 790 [1 Cal. Rptr. 765]; *People* v. *Wellman*, 141 Cal.App.2d 101, 104 [296 P.2d 82]; *People* v. *Quinn*, 77 Cal.App.2d 734, 737 [176 P.2d 404]; 77 C.J.S., Robbery, §§ 3, 9.) ▆▆▆ In this case the robbers' dominion was short-lived but actual. The evidence supports the finding of a completed robbery.

▆▆▆ Gilbert's trial took place before the California Supreme Court's decision in *People* v. *Johnson*, 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]. *Johnson* holds that in criminal trials testimony describing a witness' prior inconsistent statement may be admitted for impeachment but not as proof of the statement's contents; that the latter use would violate the defendant's constitutional right to confront and cross-

examine the declarant. In this case evidence of the extrajudicial statements of two witnesses, McCray and Corona, was admitted. Both statements were available for jury consideration as proof of the matters stated. Concededly, the *Johnson* rule was violated. The only question is whether the error was prejudicial or harmless. According to *People* v. *Johnson, supra,* 68 Cal.2d at pages 660-661, prejudice turns upon the question whether substantive use of the statements meets the *Chapman* formulation of "harmlessness beyond a reasonable doubt." (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824].)

 In order to gauge the inadmissible statements' impact, we set them in the context of the trial: Through physical evidence, testimony of police officers and testimony of distant eyewitnesses, the prosecution had established the approximate sequence of events before and after Currin's shooting. Since Currin had been alone at the station, the evidence pointing to a preconceived attempt to rob him was circumstantial. At that point the prosecution called one Woodrich, an acquaintance of the Martinez brothers. On the evening of the shooting Gilbert had come to Woodrich's house and asked for a ride home. Woodrich testified that Gilbert said, ". . . him and his brother and some other guy tried to rob a gas station, and his brother shot the gas station attendant." The prosecution then called McCray and Corona, both acquaintances of the brothers. The two witnesses had visited Gilbert after his arrival at home that night. They were in the house when the police arrived and, using an outdoor loudspeaker, told Gilbert to come out within five minutes with his hands up. At that point Gilbert made statements to his visitors. McCray denied remembering the contents of these statements. Corona testified that Gilbert had said, "Something about a gas station attendant shooting somebody in a holdup."

Over defense objections, the prosecution then adduced evidence of the two witnesses' statements to the police following Gilbert's arrest. Corona's brief extrajudicial description of Gilbert's remarks approximately duplicated his later courtroom version. McCray had told the police: "He [Gilbert] told us they pulled a job. He said that the gas station attendant was bringing them the money, he got up to the car and turned around, he ran into the station and came out with a gun, and fired three shots into the window, ordered Gilbert out of the car, laid him down face-first on the floor, then started to back

up with the gun at his head. At that time, Bobby jumped out and shot him. . . . Well, he said that there was only one bullet in the pistol they had. Apparently the guy looked over when the gun was pointed at him, and noticed that the five chambers were not loaded, so I suspect he thought that they had an unloaded gun and ran in to get his. . . . Gilbert said, oh no, please don't. He said—he said he laid down, the dude just put the gun to his head and started backing off like he was going to shoot him. He said he thought that was it. Bobby jumped out of the car and nailed him.''[1]

Corona's extrajudicial statement added negligible weight to the scales of guilt, for it was very similar to his courtroom version of Gilbert's remark. McCray's extrajudicial statement was sharply incriminating. The physical evidence had tended to show, circumstantially, that Currin had taken the money from the cash box in obedience to the trio's demands, had run into the office, put the sack of money on the desk, picked up the automatic pistol, thrown the holster on the ground, fired three shots toward the Pontiac, then had been mortally wounded by Robert's single revolver shot. McCray's inadmissible description of Gilbert's remarks furnished remarkably complete support for these circumstantial inferences. Compressed yet detailed, it described each salient fact of the holdup and shooting, even to the point of offering Gilbert's surmise of the probable explanation for Currin's attack.

Although somewhat cumulative of Woodrich's testimony, Gilbert's inadmissible statement to McCray was more comprehensive and much sharper in detail. Woodrich's testimony was part of a larger quantum of independent evidence of guilt which, minus the error, might have brought 12 reasonable jurors to a belief in guilt beyond a reasonable doubt. We are bound, however, to examine the ''entire cause,'' that is, the record as a whole. (Cal. Const., art. VI, § 13; see *People* v. *Hopper*, 268 Cal.App.2d 774, 778 [75 Cal.Rptr. 253].) There is a substantial possibility that the inadmissible evi-

---

[1]McCray's extrajudicial statement to the police was recorded on an acetate disk which was played to the jury. The disk was then marked in evidence. The disk is among the exhibits delivered to this court, but its contents have not been included in the phonographic reporter's transcript. This medium of transmitting oral evidence on appeal is inconvenient and of dubious permanence. The failure to transcribe the recording's contents as played to the jury violates rules 4 and 35, subdivision (f), California Rules of Court, which require a reporter's transcript of the oral proceedings unless the parties stipulate to a partial one. These rules govern record preparation in felony appeals. (Pen. Code, §§ 1246, 1247k.)

dence contributed to the verdict which was actually reached. (*People* v. *Ross,* 67 Cal.2d 64, 73-74, 84-85 [60 Cal.Rptr. 254, 429 P.2d 606].) Such an error "cannot . . . be conceived of as harmless." (*Chapman* v. *California, supra,* 386 U.S. at pp. 23-24 [17 L.Ed.2d at p. 710].)

In *Harrington* v. *California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726], the federal Supreme Court points to an initial stage of the analysis of harmless error which differs somewhat from that employed by the California Supreme Court in *People* v. *Johnson, supra.* Although *Harrington* did not involve a prior inconsistent statement, it did, as did *Johnson,* consider the prejudicial effect of an extrajudicial statement which was inadmissible because it violated the right of confrontation, that is, the defendant's right to cross-examine the declarant in the immediate context of his declaration. *Johnson* states that it is the *substantive use of the statement* which must be measured by the *Chapman* test of harmlessness. (68 Cal.2d at p. 660.) The majority opinion in *Harrington* indicates that *lack of opportunity to cross-examine* is the error to be measured. (23 L.Ed.2d at p. 286.)

Notwithstanding a degree of perplexity, we think the statement in *Harrington* was made in passing and not designed to articulate a rule. Weighing the effect of a nonexistent cross-examination is a dubious, speculative process. Analysis of the forbidden evidence's impact on the jury is vastly more workable and realistic. Moreover, the majority opinion in *Harrington* does not even follow the analytical method it holds forth. Rather, it pursues the orthodox process of inquiry into the evidence's probable effect upon the jury.

Judgment reversed.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied July 16, 1969.