Filed 5/29/18 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re AARON J., A Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. AARON J., Defendant and Appellant. | A145253 & A145890 (City & County of San Francisco Super. Ct. No. JW15-6063) ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |

It is ordered that the opinion filed herein on May 1, 2018, be modified as follows:

**II. DISCUSSION**

1.      The reference to "Pen. Code, § 245, subd. (a)(4))." in the first sentence of section I (BACKGROUND) of the opinion is corrected to read: "Pen. Code, § 245, subd. (a)(1))."

2.      The last sentence beginning of page 20 of the opinion and continuing onto page 21 is amended to read in full as follows: "Indeed, delaying the status assessment until after jurisdiction was, if anything, helpful to appellant, because he was able to negotiate a favorable plea agreement."

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____
STREETER, ACTING P. J.

We concur:


_____
REARDON, J.


_____
SMITH, J.*




*Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A145253 & A145890 *In re Aaron J. Modification*

Trial Court:                    City and County of San Francisco Superior Court


Trial Judge:                    Hon. Julie Tang


Counsel for Appellant:          Amanda K. Roze

                                First District Appellate Project


Counsel for Respondent:         Kamala D. Harris
                                Attorney General of California
                                Gerald A. Engler
                                Chief Assistant Attorney General
                                Jeffrey M. Laurence
                                Senior Assistant Attorney General
                                Donna M. Provenzano
                                Supervising Deputy Attorney General
                                Aileen Bunney
                                Deputy Attorney General
                                Christina Vom Saal
                                Deputy Attorney General
                                Victoria Ratnikova
                                Deputy Attorney General

A145253 & A145890 *In re Aaron J.*

3

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re AARON J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br> v. <br> AARON J., <br><br>     Defendant and Appellant. | A145253 & A145890 <br><br> (City & County of San Francisco <br>   Super. Ct. No. JW15-6063) |

In this juvenile appeal, we consider the appropriate procedure for determining—in accordance with section 241.1 of the Welfare and Institutions Code[1]—whether a juvenile who appears to come within the description of both section 300 and section 602 should be treated as a dependent or a ward. After Aaron J. (appellant) was declared a ward of the juvenile court pursuant to section 602, he appealed claiming a host of errors primarily focused on the juvenile court's decision to make him a ward rather than retain his status as a dependent minor. Specifically, appellant asserts that the county protocol under which his juvenile court status was assessed violates state law; that the juvenile court's status determination was prejudicially flawed in numerous respects; and that the juvenile court's later refusal to modify its dispositional order to reinstate dependency was

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified. All rule references are to the California Rules of Court.

1

error. Appellant also claims that the juvenile court's underlying jurisdictional finding that he committed second degree robbery is not supported by substantial evidence and that various restitution fines and administrative fees should be stricken.[2] The Attorney General concedes that a $200 restitution fine was imposed in error in this case, and we therefore strike it. However, finding any further potential errors harmless under the specific circumstances of this case, we otherwise affirm.

## I. BACKGROUND

After what can only be described as an extremely abusive and traumatic childhood,[3] appellant initially came to the attention of the delinquency court in April 2010 at the age of 12, when the San Francisco County District Attorney (DA) filed an original juvenile wardship petition pursuant to section 602 alleging that appellant had committed robbery (Pen. Code, § 211) and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(4)). The petition was suspended, appellant was placed on home supervision in accordance with section 654, and the petition was ultimately dismissed in

---

[2] In his briefing, appellant also challenged his July 2015 commitment order and the imposition of certain conditions of probation. However, by letter dated July 28, 2017, appellant's attorney acknowledged that these issues have become moot because minor was returned home in June 2016 and was subsequently committed to the Department of Juvenile Justice (DJJ). Under these circumstances, we decline to consider these additional claims.

[3] Appellant was removed at birth from a 16-year-old mother with schizophrenia who exposed him to drugs in utero. Appellant's father is also mentally ill and suffered a substantial brain injury after being struck by a car when appellant was approximately 6 months old. At about that same time, appellant was returned to his mother, despite reports that she was still abusing drugs. The child then spent the majority of the next 30 months being homeless, residing in hotels where he was exposed to "scary" situations and sexual behavior. He remembers both parents hitting him. At age three, appellant's mother left him with an acquaintance and never returned. This acquaintance eventually filed for legal guardianship and has become a consistent mother figure for appellant. Appellant has an IQ of 86, with verbal comprehension in the borderline range and impulse inhibition in the severely impaired range. He has been diagnosed with a number of mental health issues, including Post Traumatic Stress Disorder (PTSD), Anxiety Disorder, Depressive Disorder, Bipolar Disorder, Cannabis Abuse, and Impulse-Control and Conduct Disorder.

November 2010. Thereafter, in April 2012, the San Francisco Human Services Agency (Agency) filed a juvenile dependency petition with respect to appellant pursuant to section 300, alleging that his legal guardian could not safely maintain him in the family home due to his physically and verbally assaultive behaviors. The juvenile court sustained the dependency petition in May 2012 and placed appellant in foster care. He was returned to the home of his guardian in January 2013 under a family maintenance plan.

However, less than three months later, in April 2013, a second wardship petition was filed by the DA alleging that appellant had committed grand theft (Pen. Code, § 487, subd, (c)) and had received stolen property (Pen. Code, § 496, subd. (a)). He admitted to misdemeanor possession of stolen property (Pen. Code, § 496, subd. (a)). In June 2013, a third wardship petition alleged that appellant committed robbery of a transit passenger (Pen. Code, §§ 211, 212.5, subd. (a)). He admitted to felony grand theft (Pen. Code, § 487, subd. (c)). That same month, a fourth wardship petition was filed, alleging that appellant committed grand theft (Pen. Code, § 487, subd. (c)), robbery (Pen. Code, § 211), and receiving stolen property (Pen. Code, § 496, subd. (a)). Appellant again admitted to felony grand theft (Pen. Code, § 487, subd. (c)).

While appellant was pending disposition on all three of these petitions, the San Francisco Juvenile Probation Department (Probation) filed a report pursuant to section 241.1 (CASE report) recommending that appellant—a current juvenile court dependent—be made a juvenile court ward pursuant to section 602. In addition to appellant's history of delinquency, the CASE report described appellant's extensive history of behavioral referrals in the school setting, including issues with extortion, fighting, class disruptions, absenteeism, and truancy. Appellant—whose most recent report card reflected a grade point average of 0.33—was described by his Dean of Students as "out of control" and a "safety issue." At the dispositional hearing in August 2013, appellant was placed on juvenile probation under section 725, subdivision (a). Thereafter, appellant made significant progress while on probation, allowing his case to be dismissed in November 2014, earlier than expected.

Unfortunately, only four months later, on March 16, 2015, a fifth wardship petition was filed by the DA alleging that appellant, now 17 years old, had committed second degree robbery (Pen. Code, § 211.) Appellant was detained in juvenile hall. Although appellant's court appointed special advocate (CASA) and the Detention Diversion Advocacy Program both filed reports recommending that appellant be released on home supervision, this was not done. Rather, on March 25, 2015, a sixth wardship petition was filed alleging that appellant had committed robbery of a transit passenger (Pen. Code, §§ 211, 212.5, subd. (a)) and assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)).

A contested jurisdictional hearing with respect to the fifth petition was held on April 14 and 15, 2015, at the conclusion of which the juvenile court sustained the allegation of second degree robbery. Thereafter, the court amended the sixth petition to include an allegation of attempted first-degree robbery (Pen. Code, §§ 211, 664), and appellant admitted that allegation in exchange for dismissal of the remaining counts. On April 22, 2015, Probation filed a CASE report recommending that appellant be declared a juvenile court ward. The related dispositional report recommended wardship and out of home placement. An April 27 CASA report, in contrast, recommended that appellant remain a juvenile court dependent.

A contested dispositional hearing was held on May 26, 2015, focused on the issue of whether appellant should remain a dependent or be declared a ward of the juvenile court pursuant to section 241.1. At the conclusion of that hearing, the juvenile court declared wardship and ordered out of home placement with various terms and conditions of probation. That same day, appellant filed a timely notice of appeal from the juvenile court's jurisdictional findings and dispositional order.

Due to the juvenile court's decision to treat appellant as a ward pursuant to section 241.1, appellant's dependency jurisdiction was terminated on June 2, 2015, one month shy of his eighteenth birthday. However, on July 8, 2015, appellant filed a motion under sections 388 and 778 asking the juvenile court to modify its previous dispositional order to set aside its wardship determination; reinstate him as a dependent pursuant to section

4

300; and grant his request for non-wardship probation pursuant to section 725. Appellant argued that Probation had been unable to place him in out of home care before he turned 18 and that the Agency could provide services that were unavailable through Probation. The DA filed an opposition, and, after hearing on July 27, 2015, the juvenile court denied the modification petition with prejudice. Several days later, on July 30, a different juvenile court judge implemented the prior court's commitment order, sending appellant to Log Cabin Ranch (Log Cabin) until age 19.

Appellant filed an additional notice of appeal with respect to the juvenile court's denial of his modification petition. By order dated September 2, 2015, we consolidated appellant's two appeals for briefing, argument, and decision, and the combined matter is now before us for resolution.

## II. DISCUSSION

### A. *Dual Jurisdiction Issues*

The bulk of appellant's complaints stem from his disagreement with the juvenile court's decision to treat him as a juvenile court ward rather than retaining his status as a dependent minor. As we recently had occasion to summarize: "A child who has been abused or neglected falls within the juvenile court's protective jurisdiction under section 300 as a 'dependent' child of the court. In contrast, a juvenile court may take jurisdiction over a minor as a 'ward' of the court under section 602 when the child engages in criminal behavior. [Citations.] As a general rule, a child who qualifies as both a dependent and a ward of the juvenile court cannot be both. (§ 241.1, subd. (d); *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1012, 1015 (*Marcus G.*).) Instead, section 241.1 sets forth the procedure that the juvenile court must follow when faced with a case in which it may have dual bases for jurisdiction over a minor." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1505-1506, fn. omitted (*M.V.*).)

Pursuant to section 241.1: "Whenever a minor appears to come within the description of both Section 300 and Section 601 or 602, the county probation department and the child welfare services department shall, pursuant to a jointly developed written protocol . . . , initially determine which status will serve the best interests of the minor

5

and the protection of society. The recommendations of both departments shall be presented to the juvenile court with the petition that is filed on behalf of the minor, and the court shall determine which status is appropriate for the minor." (§ 241.1, subd. (a); but see § 241.1, subd (e) [authorizing development of a written county protocol to allow for a minor's designation as a dual status child under specified circumstances].) Here, appellant takes issue both with San Francisco's Protocol for Implementation of Welfare & Institutions Code section 241.1 (variously, Protocol or San Francisco Protocol) and with the juvenile court's status determination made pursuant to that Protocol and section 241.1. We address each argument in turn.

   1. *Validity of San Francisco Protocol*

  As stated above, in order to address potential dual status situations, the probation department and the child welfare department in each county are required to develop a joint written protocol designed to "determine which status will serve the best interests of the minor and the protection of society." (§ 241.1, subd. (a).) The purpose of the protocol is to ensure both "appropriate local coordination in the assessment" of minors and "the development of recommendations by these departments [i.e., child welfare and probation] for consideration by the juvenile court." (*Id.*, subd. (b)(1).) A valid protocol must require, at a minimum, consideration of the following eight factors when making the necessary assessment: (1) the nature of the referral; (2) the age of the minor; (3) the prior record of the minor's parents for child abuse; (4) the prior record of the minor for out-of-control or delinquent behavior; (5) the parents' cooperation with the minor's school; (6) the minor's functioning at school; (7) the nature of the minor's home environment; and (8) the records of other agencies that have been involved with the minor and his or her family. (*Id.*, subd. (b)(2).) In addition, a protocol must include "provisions for resolution of disagreements between the probation and child welfare services departments regarding the need for dependency or ward status." (*Ibid.*)

  Section 241.1 requires that, pursuant to a protocol, *consideration* be given to the above-described eight factors when assessing a minor. The statute does not demand, however, that the assessment be in writing. (§ 241.1.) Rule 5.512, in contrast, requires

6

the preparation of a "joint assessment report" which must include a discussion of the eight statutory factors, along with four additional items: (1) the history of any physical, sexual, or emotional abuse of the child; (2) any services or community agencies available to assist the child and his or her family; (3) a statement by any counsel currently representing the minor; and (4) a statement by any CASA currently appointed for the child. (Rule 5.512(d).)[4] In addition, rule 5.651—which deals generally with educational and developmental services for juvenile court dependents and wards—provides that a report for a joint assessment hearing should include, to the extent available, information regarding the child or youth's educational and developmental history and needs. (Rule 5.651(c).) In this regard, the rule states that a joint assessment report should include "separate statements by the child welfare department and the probation department, each addressing whether the child or youth may have a disability and whether the child or youth needs developmental services or special education and related services or qualifies for any assessment or evaluation required by state or federal law." (Rule 5.651(c)(16).) Moreover, "[a] copy of the current individualized education program [(IEP)] should be attached to the report unless disclosure would create a risk of harm. In that case, the report should explain the risk." (Rule 5.651(c)(8)(i).)

Rule 5.512 additionally mandates that "[t]he joint assessment report must contain the joint recommendation of the probation and child welfare departments if they agree on the status that will serve the best interest of the child and the protection of society, or the separate recommendation of each department if they do not agree." (Rule 5.512(d).) Finally, "[o]nce the recommendations of both departments are presented to the juvenile court, it remains for the court to 'determine which status is appropriate for the minor.' (§ 241.1, subd. (a); see rule 5.512(g) [court must make a determination regarding the appropriate status of the minor and must state its reasons on the record or in a written

---

[4] Rule 5.512 does not require that any records of other agencies be included in the report (cf. §241.1, subdivision (b)(2) [requiring consideration of records in assessment]), but instead mandates discussion of "[t]he history of involvement of any agencies or professionals with the child and his or her family." (Rule 5.512(d)(9).)

order].)" (*M.V.*, *supra*, 225 Cal.App.4th at p. 1506.)  Appellant argues here that the San Francisco Protocol violates section 241.1 and rules 5.512 and 5.651 in numerous ways.

For instance, the Protocol establishes the Juvenile Court Committee for Assessment and Status Evaluation (CASE) for purposes of undertaking the assessment required by section 241.1.  CASE is comprised of three individuals, representatives appointed from Probation, the Agency, and the City Attorney's Office.   (Protocol for Implementation of Welfare & Institutions Code, § 241.1 (January 2008) <http://www.sfsuperiorcourt.org/sites/default/files/pdfs/1861%20Protocol%20for%20Im plementation%20of%20Welfare%20and%20Institutions%20Code%20Section%20241.1. pdf?1517005853448> (as of May 1, 2018) (Protocol) § 2 at p. 1.)[5]  According to the Protocol:  "The recommendation of appropriate Juvenile Court jurisdiction shall be based upon a vote of the two standing CASE members from the Juvenile Probation Department and the Department of Human Services. . . .   In the event of a tie vote, the City Attorney's representative shall determine the appropriate recommendation [for] inclusion in the assessment report."  (*Id.*, § 4(c) at p. 2.)

While acknowledging that the San Francisco Protocol "does not provide for disclosure of internal disagreements," the Attorney General asserts that it does specify a reasonable method of resolving conflict as mandated by subdivision (b)(2) of section 241.1.  Appellant, in contrast, argues strenuously that the Protocol violates state law by removing the existence of any disagreement from the view of the court and the parties, rather than providing "the separate recommendation of each department if they do not agree."  (See rule 5.512(d); see also § 241.1, subd. (a) ["The recommendations of both departments shall be presented to the juvenile court . . . ."]; *id.*, subd. (b)(1) [purpose of protocol to ensure "the development of recommendations *by these departments* for consideration by the juvenile court," italics added].)  According to appellant—in addition to these statutory and rule violations—the Protocol, by fostering secrecy, also runs

---

[5] Although not part of the record below, we took judicial notice of the San Francisco Protocol, at appellant's request, by order dated January 27, 2016.

8

contrary to an underlying purpose of section 241.1, which is to ensure that "juvenile court judges will have the maximum information necessary to make decisions based upon the needs of the child, the family, and society." (See Assem. Com. on Judiciary, Rep. on Sen. Bill No. 220 (1989-1990 Reg. Sess.) as amended Aug. 21, 1989, p. 2 (Assembly Report); see also Connor, *The Best Interests of the Minor: Assessing California's Ban on Dual Jurisdiction in the Juvenile Courts* (2003) 7 U.C. Davis J. Juv. L. & Pol'y 285, 289 (Connor).)[6]

Appellant additionally claims that the designation of the City Attorney's representative as the tie-breaking third member of CASE is improper because both section 241.1 and the related court rule contemplate collaboration solely by the probation and child welfare departments when making status recommendations. (See § 241.1, subd. (a); *id*., subd. (b)(1) [purpose of protocol to ensure "the development of recommendations *by these departments* [i.e., probation and child welfare] for consideration by the juvenile court"]; rule 5.512(a), (d) & (i); rule 5.651(c)(16).) Moreover, appellant asserts, the City Attorney's representative is wholly unqualified to make such an important determination as he or she is not permitted to engage in nonlegal work; is not required to have any expertise or training in child welfare; is under no legal duty to act in a particular minor's best interest; and has been given no guidelines for decision, such that the tie-breaking vote could be cast "on the basis of a coin toss." (See generally Protocol; San Francisco Charter, § 6.102.) The Attorney General has no real

---

[6] Appellant also argues that the Protocol improperly limits the information provided to the juvenile court by not allowing the attachment to the assessment report of any documents used by CASE in formulating its recommendation and by failing to allow "separate statements by the child welfare department and the probation department, each addressing whether the child or youth may have a disability and whether the child or youth needs developmental services or special education and related services or qualifies for any assessment or evaluation required by state or federal law," both in contravention to rule 5.651. (See rule 5.651(c)(8)(i) [suggesting attachment of current IEP to joint assessment report] & (c)(16) [seeking separate statements as described above]; Protocol, § 7 at p. 3 [no documents shall be attached to the assessment report].)

response to these arguments, stating only that the addition of a representative from the City Attorney's Office to CASE "does not violate the spirit or letter of the statute."

Appellant further maintains that the Protocol is improper to the extent it requires supervisory personnel to make assessment determinations. (See Protocol, § 2 at p. 1 [Probation representative appointed to CASE must "hold the position of supervising supervision probation officer, or above"; Agency representative must "hold the position of section manager, or above"]; see also *id.*, § 4(c) at p. 2 ["The case-carrying probation officer and case-carrying child welfare worker shall not be voting members of CASE"].) According to appellant, giving decision-making authority to individuals far removed from the "day to day realities of the minor's life" violates both the terms and the intent of the law. However, the Protocol does provide that "[e]very effort shall be made to secure the attendance and participation of the minor's assigned probation officer and child welfare worker at each meeting at which specific cases are evaluat[ed]." (*Id.*, § 2 at p. 1.) And, in fact, both case-carrying workers attended the CASE meeting here at issue. In addition, the Attorney General suggests in response that involvement of supervisory personnel may foster "continuity in assessment as well as dedication to the seriousness of the proceedings."

Finally, appellant finds fault with the San Francisco Protocol to the extent it improperly limits the input required for adequate assessment. As mentioned above, one of the underlying purposes of section 241.1 is to ensure that "juvenile court judges will have the maximum information necessary to make decisions based upon the needs of the child, the family, and society." (See Assembly Report, *supra*, at p. 2.) However, the Protocol does not allow for input from a minor's CASA or delinquency attorney at CASE meetings and limits the participation of any dependency attorney to five minutes.[7] This is

---

[7] Specifically, the Protocol provides: "[T]he minor's dependency attorney may be invited to attend the CASE meeting. The minor's dependency attorney may attend the first five minutes of the portion of the CASE meeting dedicated to discussing the attorney's client. The attorney may present any relevant information that might prove helpful to CASE in completing its assessment and evaluation. Upon completion of the presentation, the attorney will be asked to leave the meeting. In the event that the minor's dependency

10

true despite the requirement that the joint assessment report reflecting the CASE recommendation include statements from *any* counsel currently representing the minor as well as any currently-appointed CASA. (Rule 5.512(d)(11) & (12).) At least one commentator has criticized the limited flow of information upon which CASE determinations in San Francisco are made as follows: "Without input from the minor's CASA representative, delinquency attorney, or other individuals involved in the child's life, the San Francisco assessment committee fails to meet the goal of section 202, 'to secure for the minor, custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents.' Any parent required to make a decision as far-reaching and important to his [or her] child's future as a 300 versus a 600 status, would presumably seek out rather than avoid relevant information related to his or her child's needs and the resources available to meet those needs." (Connor, *supra*, at p. 321.)

Not all of appellant's arguments are persuasive. For instance, nothing in state law prohibits supervisory staff from making status assessments pursuant to section 241.1, and it does not appear unreasonable to place authority for these often difficult decisions on senior personnel who have broad experience over many cases; who may be more likely to engage in a reasoned analysis precisely because they are less emotionally invested in each particular case; and whose ultimate determinations are less likely to negatively impact a case-carrying worker's continuing relationship with the minor. In other instances, appellant has improperly conflated the requirements for making an assessment decision pursuant to a section 241.1 protocol with the required elements of a joint assessment report. As an example, nothing in state law requires input from a minor's attorneys and/or CASA during a CASE meeting. Rather, the statements of these

---

attorney is unable to attend the CASE meeting, the attorney may make a written submission for consideration. . . . [¶] . . . Nothing in this protocol is intended to permit any other person, other than the minor's dependency attorney, to attend CASE meetings." (Protocol, § 3 at p. 1.)

individuals must only be included in the subsequent joint assessment report presented to the juvenile court.  (Cf. § 241.1, subd. (b)(2), and rule 5.512(11)-(12).)

We do, however, find the Protocol's tie-breaking procedure to be quite troubling. Not only does such a process appear to fly in the face of the requirement that status disagreements between the probation and child welfare departments be reported to the juvenile court, but it also grants ultimate authority for the status recommendation to an unaffiliated third party with no expertise or framework for decision-making.  Such an arbitrary process inspires little confidence that the resulting recommendation will accurately reflect "which status will serve the best interests of the minor and the protection of society."[8]  (See § 241.1, subd. (a).)

Although the Attorney General suggests that we refuse to reach this issue because the validity of the Protocol was not litigated in the juvenile court, we tend to agree with appellant that, at least in the abstract, the ongoing legality of the assessment procedures established by the Protocol is of sufficient importance to a large enough group to merit relaxation of the forfeiture rule.  (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293, superceded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654.)  Ultimately, however, we need not reach the forfeiture question; nor need we finally determine whether or to what extent the Protocol violates state law.  Instead, our review of the record makes clear that—whatever the legal shortcomings of the San Francisco Protocol—any violations are,

---

[8] We recognize that, since both Probation and the Agency have consented to the procedure outlined in the Protocol, they have essentially agreed that they will never disagree.  On this basis, it could be argued that the single CASE recommendation generated in a tie-break situation is, in fact, the recommendation of both departments and thus separate statements are not required to be included in the joint assessment report. (See rule 5.512(d); see also § 241.1, subds. (a) & (b).)  While perhaps analytically elegant, such a position appears to violate the spirit, if not the letter, of state law.  The fact that the two departments disagreed to the extent that the tie-break procedure was triggered, the bases for their disagreement, and the position endorsed by each department all seem to be circumstances highly relevant to a juvenile court attempting to determine "which status is appropriate for the minor."  (§ 241.1, subd. (a).)  Yet the Protocol hides all of this information from the court.

as the Attorney General posits, harmless under the specific facts of this case. (See *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [errors which are not "jurisdictional in the fundamental sense" are subject to a harmless error analysis]; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 412-413 [in dependency context, errors or omissions in assessment do not rise to the level of a denial of due process]; *In re Eugene R.* (1980) 107 Cal.App.3d 605, 615 [where there is substantial compliance with probation social study requirement, errors are not of constitutional dimension and require reversal only if, absent the error, it is reasonably probable that a result more favorable to the minor would have occurred], questioned on other grounds in *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 115-116, fn. 20 and *In re Michael D.* (1987) 188 Cal.App.3d 1392; see also Cal. Const., art. VI, § 13 [trial error is not reversible unless it constitutes a miscarriage of justice].)

Here, after summarizing appellant's past involvement with both Probation and the Agency as well as his mental health needs, the CASE report recommended that appellant be declared a juvenile court ward. The dispositional report filed by Probation described the details of his two current offenses; summarized his prior history with both Probation and the Agency; detailed appellant's problematic educational history; noted his first IEP referral at the age of four due to delays in speech, social skills, and motor skills; set out appellant's family situation; discussed his mental health history; opined that appellant remained a danger to himself and the community and required a more structured and secure setting; and similarly recommended that appellant be made a ward of the juvenile court. Further, according to the dispositional report, the recommendation of the Multiple Discipline Treatment (MDT) Committee was out of home placement, although the MDT considered commitment to DJJ due to appellant's "criminal history of robberies and the ineffectiveness of the lengthy list of services that [had] been provided to him while at home in the community." The report also mentioned that a dependent is automatically eligible for AB12 funding, whereas, for a delinquent ward, such funding is conditioned on the successful termination of probation.

On the other side of the coin, appellant's CASA filed an eight-page report with the court which detailed his extensive history with appellant; summarized the current

services appellant was receiving from his dependency team; noted that appellant has been steadily addressing his significant history of childhood trauma; stated his belief that it would be extremely detrimental to appellant if his relationship with that team was severed; described appellant's personality and positive connection to his guardian and half-brother; indicated that he (the CASA) was allowed to attend, but not participate in, appellant's CASE meeting; observed that appellant's detention with people that he does not trust has had an observable deleterious effect on his well-being; and strongly recommended that appellant be maintained as a dependent so that he could retain the support of his existing team as he completed high school and transitioned to adulthood. In addition, while appellant's contested dispositional hearing was pending, a neuropsychological assessment was completed at the request of appellant's defense attorney and filed with the court. This evaluation exhaustively discusses appellant's history and level of functioning, including his ongoing need for special education services, and concludes that appellant "has serious mental health issues, cognitive deficits and severe abandonment issues. He will need close supervision, structure, appropriate academic interventions and psychotropic and therapeutic mental health interventions to help improve his behavior, mature his decision-making, and desist from conduct that results in legal problems." The evaluator recommended out of home placement in a setting that could provide mental health care, educational interventions for his special education needs, behavioral interventions, and continued contact with his current support team.

Thereafter, at the contested hearing on May 26, 2015, six witnesses testified in support of maintaining appellant as a juvenile court dependent. Specifically, appellant's current therapist Dr. Hicks testified that he was treating appellant, in particular for PTSD, and that the loss of appellant's current service providers through the dependency court would be detrimental to appellant. Linn Chiu had been appellant's social worker through the probate court for the past five years. She testified regarding appellant's complex problems which required "a lifelong process of healing"; commented that with support

14

and medication monitoring appellant could make good decisions; and also opined that it was critical for appellant's rehabilitation that he keep the same treatment team.

Appellant's CASA testified about his relationship with appellant, appellant's positive personality traits, and the progress appellant had been making prior to his arrest. As in his written report, he argued it was very important that appellant retain his current treatment team. Sean Cochrun worked with appellant's half-brother and had provided substance abuse counseling for appellant beginning in September 2014. He testified that progress in treatment is not always linear and that the services appellant had been receiving were working. Appellant's legal guardian testified that it took her 13 years to gather appellant's current team of service providers and opined that, if his support team changed, it would be like starting over because appellant does not respond well to change. Moreover, if he does not like the staff he is working with, it won't do any good. She believed appellant could stay out of trouble if he stayed on his medication with his current support team. Finally, appellant, himself, testified about his strong connection to his treatment team and stated that taking his medication while in custody was helping him. He wanted to change and believed that he could.

The court also reviewed a written statement from appellant, positive letters from current teachers in juvenile hall, a letter from his dependency attorney recommending continued dependency, and a short letter from Dr. Hicks summarizing his testimony. Nevertheless, after argument, the juvenile court declared appellant to be a juvenile court ward. In doing so, the court opined as follows: "I believe Aaron should be placed out of home. At age 17 Aaron is in a transitional period into adulthood, and since 2012, as is reported, he has been slowly spiral[ing] out of control. [¶] This is a very important period in your life, Aaron, and probably the last chance for the Court to assert some influence over you on rehabilitation from crime. [¶] Now, while I agree that the team that's been working with Aaron has been a positive influence on Aaron, probably saved him from some even more serious crimes, I'm not convinced that Aaron will not benefit from a different approach, such as a structured environment where he can [hone] in on his dreams and apply what he's learned from his team, that he's trusting of other adults and

15

himself. And if Aaron were the good, kind child that everyone said he was—and I have no reason to doubt that he is not—then he would have enough foundation to accept changes that are inevitable, and also to accept the consequences of his own conduct and behavior that brought him into the criminal justice system in the first place."

Given this record, we have no difficulty finding the potential problems with the San Francisco Protocol harmless under any standard. The juvenile court was provided with exhaustive information regarding appellant, including information with respect to all of the factors required to be considered under any 241.1 protocol. The court heard from all of appellant's attorneys, his CASA, his legal guardian, and appellant, himself. Moreover, the arguments in favor of both dependency and wardship were clearly articulated for the court's benefit. While the court was not presented with evidence regarding which agency voted for what status in the CASE meeting, given the Protocol, the court knew that either one or both departments supported wardship, as the resulting CASE recommendation was for wardship. Under these circumstances, we do not believe that confirming whether or not there was a split vote and how each particular party voted would have made any difference to the juvenile court's status determination. Rather, the court clearly heard all of the reasons for maintaining dependency jurisdiction and nonetheless decided to go the other way based on the escalation in appellant's offenses and the failure of his current rehabilitative services to stop this trend.[9]

2.      *Juvenile Court Status Determination*

In addition to finding fault with the San Francisco Protocol, appellant also challenges the juvenile court's status determination, itself, on numerous grounds. Specifically, in addition to arguing that the court's 241.1 determination was made using

---

[9] Appellant's argument that the problems with the Protocol were prejudicial because an assessment in accordance with the statutory requirements "should have resulted in a determination to maintain dependency jurisdiction," thereby allowing him to maintain his treatment team and avoid felony adjudications that could "haunt him for the rest of his life," merely evinces a disagreement with how the juvenile court decided a difficult case. The question here is whether the identified error likely changed the outcome; not whether appellant would have personally preferred a different result.

an invalid protocol, he also asserts that the timing of the assessment report was improper; that the report failed to include all mandated elements; that the juvenile court failed to provide an adequate statement of reasons for its decision; and that the court's determination was not sufficiently supported by the evidence. "We review the juvenile court's determination under section 241.1 for abuse of discretion. [Citation.] 'To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.' [Citation.] Throughout our analysis, we will not lightly substitute our decision for that rendered by the juvenile court. Rather, we must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings where there is substantial evidence to support them. [Citation.]" (*M.V.*, *supra*, 225 Cal.App.4th at pp. 1506-1507; see also *id.* at p. 1513 [reading section 241.1 as granting "broad discretion to the juvenile court when determining which status will best meet a particular minor's needs"].) Of course, to the extent our analysis involves statutory interpretation, this is a legal matter which is subject to our de novo review. (*In re T.G.* (2015) 242 Cal.App.4th 976, 987.)

We have already found that any inadequacies in the Protocol did not materially affect the juvenile court's status determination. Appellant's argument that the juvenile court abused its discretion by declaring him a ward without a specific statement of reasons is similarly unpersuasive. It is true, as stated above, that, pursuant to rule 5.512(g), a juvenile court making a status determination is required to state its reasons for that determination on the record or in a written order. However, the juvenile court did that here. Specifically, as detailed above, the court was clearly concerned with appellant's escalating behaviors and, in that context, determined that—despite the positive impact of his dependency team—appellant would benefit from a "different approach" that would allow for a structured environment in which he could accept the consequences of his own conduct. We find this statement to be sufficient under rule 5.512(g). Indeed, the court reiterated the bases for its status determination at a later hearing, stating that, at the time of disposition, it believed appellant to be "highly

recidivist," that his behavior was escalating, and that "he was a danger to the community and to himself." Moreover, while an argument could certainly be made on these facts that treating appellant as a juvenile court ward would not serve his best interests or the protection of society, that does not mean that the juvenile court's wardship determination was an abuse of its broad discretion in this area. Indeed, appellant's many assertions to the contrary notwithstanding, we find the court's determination to be amply supported by the record. The fact that appellant strenuously disagrees with the court's decision does not make it error.

Appellant next attacks the juvenile court's status determination in this matter because the CASE assessment considered by the court failed to include many of the elements mandated by statute and related court rule as outlined above. Although not argued below, the CASE report is undeniably brief and failed to include all of the information required by state law. However, as we recently held in *M.V.*: " 'When a parent challenges an assessment report as inadequate, the reviewing court evaluates any deficiencies in the report in view of the totality of the evidence in the appellate record.' (*In re Michael G.* (2012) 203 Cal.App.4th 580, 591; see *Crystal J., supra*, 12 Cal.App.4th at p. 413 [deficiencies in report insignificant in light of the totality of evidence before the court, including other reports and live testimony].)" (*M.V., supra*, 225 Cal.App.4th at p. 1511.) We concluded in *M.V.* that, since "the vast majority" of the evidence that the minor complained was missing from the status assessment was before the court from other sources, "any technical deficiencies in the assessment were harmless." (*Ibid.*) The same is true in this case, as we described at length above in connection with our discussion of the San Francisco Protocol. In short, the juvenile court heard from all the necessary parties and considered significant evidence regarding all of the required factors. Under these circumstances, any deficiencies in the CASE report were harmless.[10]

_____

[10] Given the breadth of information available to the court in this matter, we find the recent case of *In re R.G.* (2017) 18 Cal.App.5th 273, 289-292 (*R.G.*)—which found report deficiencies not harmless—distinguishable on its facts.

18

Appellant's final challenge to the propriety of the juvenile court's status determination involves the timing of the CASE report. The report was filed on April 22, 2015, a week after the jurisdictional hearing in this matter, although the CASE meeting at which the assessment recommendation was generated occurred on March 31, 2015. Appellant argues that the assessment report should have been prepared and filed with or before the wardship petition in this case (March 16, 2015), or, at the very least, prior to the jurisdictional hearing on April 14-15, 2015.

Subdivision (a) of section 241.1 does state that a joint recommendation regarding status "shall be presented to the juvenile court with the petition that is filed on behalf of the minor, and the court shall determine which status is appropriate." We have previously construed this statement to mean that the assessment should be presented in connection with the later petition—that is, the petition that creates the potential for dual jurisdiction. (*Marcus G.*, *supra*, 73 Cal.App.4th at p. 1013.) Thus, a fair reading of the statutory requirement is that the recommendation of the two departments should be presented to the juvenile court, *along with the filed second petition*, for a status determination at some point prior to the second court's status decision—i.e., prior to the dispositional hearing on the second petition. That was done in this case.

It is the court rule—rule 5.512—that establishes more restrictions regarding the timing of the assessment and related report. For instance, rule 5.512 states that, "[w]henever possible, the determination of status must be made before any petition concerning the child is filed" (rule 5.512(a)(2)) and that the "assessment must be completed as soon as possible after the child comes to the attention of either department" (rule 5.512(a)(1)). "In addition, rule 5.512 is quite specific regarding the timing for the actual assessment report: 'If the child is detained, the hearing on the joint assessment report must occur as soon as possible after or concurrent with the detention hearing, but no later than 15 court days after the order of detention and before the jurisdictional hearing. If the child is not detained, the hearing on the joint assessment must occur before the jurisdictional hearing and within 30 days of the date of the petition.' (Rule 5.512 (e).)" (*M.V.*, *supra*, 225 Cal.App.4th at p. 1507.)

19

As we noted in *M.V.*, however: "[A]t least one commentator has indicated that the timeframes set forth in rule 5.512(e) may be contrary to the best interests of the minor and the protection of society and therefore void as inconsistent with the intent of section 241.1. (See Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2013 ed.) § 3.27[2], p. 3-52, citing *California Court Reporters Assn. v. Judicial Council of California* (1995) 39 Cal.App.4th 15, 24–26.) This is because a decision to terminate one status should not be made until after a determination that the jurisdictional allegations supporting the alternate status are true. (*Id.* at p. 3-51.) As is pertinent to the present matter, '[s]ince the full nature of the delinquency allegations may not become clear until after they have been litigated and the juvenile court may or may not find those allegations true,' there may be 'substantial merit' to deferring the section 241.1 determination until after the jurisdiction hearing in the appropriate case. (*Id.* at pp. 3-51 to 3-52.)" (*M.V.*, *supra*, 225 Cal.App.4th at p. 1507, fn. 4.) While this argument appears well taken—and certainly seems to align with the Legislature's expressed intent that juvenile court judges have "the maximum information necessary to make decisions based upon the needs of the child, the family, and society" (Assembly Report, *supra*, at p. 2)—we need not decide here whether the timing requirements of rule 5.512 are invalid as contrary to section 241.1. Rather, we again conclude that, even if a timing error did occur in this case with respect to the assessment and related report, any such error was harmless.[11]

Had the juvenile court made its status determination prior to litigating the jurisdictional facts, it would presumably have assumed that they would be found true for purposes of its analysis: Otherwise, there would be no reason to even consider the dual status issue. Thus, the juvenile court would have contemplated the exact situation that actually came to pass in this case and—given the bases for its ultimate status determination (recidivism, need for a secure environment, and need to accept the consequences of his conduct)—would undoubtedly have reached the same result. Indeed,

---

[11] And, we also find *R.G.*'s conclusion that certain timing issues were not harmless factually distinguishable. (*R.G.*, *supra*, 18 Cal.App.5th at pp. 292-293.)

delaying the status assessment until after jurisdiction was, if anything, helpful to appellant, because he was initially facing three strikes, but was able to negotiate a favorable plea agreement limiting him to two sustained strike offenses. We therefore decline to disturb the juvenile court's status determination due to noncompliance with the rule 5.512 timeframes.

**B.**     ***Denial of Modification Petition***

As mentioned above, after disposition was completed in this matter—resulting in a declaration of wardship and referral for out of home care—appellant filed a motion under sections 388 and 778 asking the juvenile court to modify its previous dispositional order to set aside its wardship determination; reinstate him as a dependent pursuant to section 300; and grant his request for non-wardship probation pursuant to section 725.[12] Appellant argued that Probation had been unable to place him in out of home care before he turned 18 and that the Agency could provide services that were unavailable through Probation. The DA opposed appellant's motion, contending that there were no changed circumstances sufficient to justify the proposed modification and that it was in appellant's best interest to be placed in a secure setting that could meet his needs. After hearing on July 27, 2015, the juvenile court denied the modification petition with prejudice. Appellant now claims that this decision by the juvenile court was error.

Preliminarily, we note that appellant's argument that the Agency had an out of home placement available to it—St. Vincent's—that would meet appellant's special educational needs, is factually incorrect. Probation informed the court on July 2, 2015, that it had talked to St. Vincent's and that the potential placement had refused to accept appellant back because it believed that it was no longer a good fit for his needs. We are equally unpersuaded that the juvenile court maintained wardship due to a mistaken impression that the dependency court could no longer take appellant back because he had

---

[12] Both section 388 and 778 allow for the modification of a prior juvenile court order upon grounds of change of circumstances or new evidence if such modification appears to be in the best interests of the child. (§ 388, subds. (a)(1) & (d) [dependency proceedings]; § 778, subd. (a) [wardship proceedings].)

21

turned 18. While the court discussed this issue, it ultimately based its decision to deny the petition on its previous findings that appellant should participate in an out-of-home placement to continue his rehabilitation. Indeed, the court made its order regardless of whether it resulted in a higher level of care, because it believed it necessary given appellant's escalating behaviors and the danger he posed to himself and the public.

The remainder of appellant's arguments are a rehash of the evidence presented in favor of maintaining appellant's dependency status at the original dispositional hearing. The juvenile court considered all the evidence and determined that wardship was nevertheless appropriate because it believed that appellant would benefit from a "different approach." And, we have already concluded that this status determination was supported by substantial evidence. The juvenile court's decision as to whether a previously made juvenile court order should be modified rests within the court's discretion and thus will not be disturbed on appeal unless an abuse of discretion is clearly established. (*In re Michael B.* (1992) 8 Cal.App.4th 1698 [dependency proceedings]; *In re Corey* (1964) 230 Cal.App.2d 813, 831-832 [wardship proceedings].) We find no abuse.

## C. *Sufficiency of the Evidence for Second Degree Robbery: Asportation*

We next consider appellant's assertion that there was insufficient evidence to support the juvenile court's finding that he committed second degree robbery. When addressing claims of insufficient evidence in the context of a juvenile court judgment sustaining criminal allegations, "we must apply the same standard of review applicable to any claim by a criminal defendant challenging the sufficiency of the evidence to support a judgment of conviction on appeal." (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371 (*Ryan N.*).) Thus, " ' "we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . ." ' '[W]e presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806; see also *Ryan N.*, *supra,* 92

Cal.App.4th at p. 1371.)  Reversal is warranted only where it appears " 'that upon no hypothesis what[so]ever is there sufficient substantial evidence to support [the judgment.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331; see also *Ryan N.*, *supra,* 92 Cal.App.4th at p. 1372.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.)  The "taking" aspect of robbery consists of two parts—" 'gaining possession of the victim's property and asporting or carrying away the loot.' " (*People v. Rodriguez* (2004) 122 Cal.App.4th 121, 130; see also *People v. Lopez* (2003) 31 Cal.4th 1051, 1056 (*Lopez*).)  In this case, the minor argues that there was insufficient evidence of asportation.  Thus, the other elements of robbery are not at issue.

The asportation element of a robbery allegation is satisfied when the accused exercises dominion and control over the victim's possessions through some small movement of those possessions.  (*People v. Price* (1972) 25 Cal.App.3d 576, 578 (*Price*).)  Indeed, cases repeatedly emphasize that the crime of robbery is completed upon *any* asportation, however slight or short.  (*People v. Williams* (2013) 57 Cal.4th 776, 787; *People v. Hill* (1998) 17 Cal.4th 800, 851-852 (*Hill*); *People v. Cooper* (1991) 53 Cal.3d 1158, 1165; *People v. Pham* (1993) 15 Cal.App.4th 61, 65; *Price*, *supra,* 25 Cal.App.3d p. 578; *People v. Martinez* (1969) 274 Cal.App.2d 170, 174; *People v. Pruitt* (1969) 269 Cal.App.2d 501, 503, 505 (*Pruitt*).)  Moreover, "once there has been a taking, 'it is no defense that the property taken was restored, even though this occurs almost immediately.' " (*Hill*, *supra,* 17 Cal.4th p. 852; see *People v. Quiel* (1945) 68 Cal.App.2d 674, 679 ["The fact that the thief is frustrated in his attempt to carry stolen property away, or that he may change his mind immediately after the theft, because he concludes that the property is of insufficient value to warrant him in retaining it, does not relieve him of the consequence of the theft"].)

Thus, for instance, in *Hill*—the case primarily relied upon by the juvenile court below—our Supreme Court found substantial evidence of asportation where the robber took the victim's purse from her possession, moved it a slight distance from inside the car

23

to his possession, found nothing of value in it, and returned the purse to her. (*Hill*, *supra*, 17 Cal.4th at pp. 851-852.) Similarly, in *Pruitt*, the robber dragged the victim into a driveway, hit him, sat on him, and removed a wallet from the victim's pocket. (*Pruitt*, *supra*, 269 Cal.App.2d at pp. 502-503.) When the victim told him there was no money in it, the robber handed the wallet back to the victim. (*Id.* at p. 503.) The Court of Appeal concluded that "the taking of the wallet from the person of [the victim], even though it was promptly handed back, constituted a robbery." (*Id.* at p. 505.)

In the present case, the victim testified that the minor hit him several times in the face, took his cellphone out of his pocket without permission, and held onto it until he decided to return it when the police arrived. Thus, during this—albeit brief—timeframe, the minor took possession of the phone in the victim's pocket and removed the phone into his own custody and control. Even though the minor's exercise of control and dominion over the phone was short, it was clearly sufficient under existing case law.[13] We see no error.[14]

## D.    *Fines and Fees*

As a final matter, appellant asserts that the $200 restitution fine assessed against him in accordance with section 730.6 was error and was also improperly assessed twice—both at his original dispositional hearing on May 26, 2015, and at his later dispositional hearing on July 30, 2015, when his prior out of home placement order was vacated and he was committed to Log Cabin. He further claims that an administrative fee

---

[13] We reject the minor's argument that the juvenile court's ruling somehow reflected a misapprehension of the law of asportation because the court misstated some of the pertinent facts of *Hill*. Nor do we find particularly relevant that the court at one point erroneously stated that the minor removed the cellphone from the victim's backpack instead of his pocket. Review of the entire colloquy among court and counsel makes clear that the court was aware that only slight movement is required to prove asportation and that possession of the cellphone by the minor, plus some small movement, occurred in this case. Substantial evidence supports this determination.

[14] Because we conclude that there was sufficient asportation of the victim's cellphone to support the juvenile court's second degree robbery finding, we need not address the Attorney General's alternate argument that the minor was also an aider and abettor in his co-defendant's forcible taking of a speaker from the victim's backpack.

of $20 was similarly imposed twice, once at each dispositional hearing. We agree with the Attorney General that the juvenile court's recitation of the restitution fine and administrative fee at the later hearing was merely a reiteration of the previous court order and thus only one restitution fine and one administrative fee were imposed in this case. Indeed, the minute order for the July 2015 hearing specifically states that the fine and the fee should be paid "as previously ordered on 5-26-15." However, as the Attorney General concedes, subdivision (g)(2) of section 730.6 states that "[i]f the minor is a person described in subdivision (a) of Section 241.1, the court shall waive imposition of the restitution fine." Thus, even the single restitution fine of $200 was imposed in error and must be stricken.

## III. DISPOSITION

The case is remanded with directions for the superior court clerk to correct the minutes of the dispositional hearings on May 25 and July 30, 2015, to reflect the fact that the $200 restitution fine has been stricken. In all other respects, the judgment is affirmed.

25

_____
REARDON, J.

We concur:

_____
STREETER, ACTING P. J.

_____
SMITH, J. *

*Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A145253 & A145890 *In re Aaron J.*

Trial Court:                    City and County of San Francisco Superior Court


Trial Judge:                    Hon. Julie Tang


Counsel for Appellant:          Amanda K. Roze

                                First District Appellate Project


Counsel for Respondent:         Kamala D. Harris
                                Attorney General of California
                                Gerald A. Engler
                                Chief Assistant Attorney General
                                Jeffrey M. Laurence
                                Senior Assistant Attorney General
                                Donna M. Provenzano
                                Supervising Deputy Attorney General
                                Aileen Bunney
                                Deputy Attorney General
                                Christina Vom Saal
                                Deputy Attorney General
                                Victoria Ratnikova
                                Deputy Attorney General

A145253 & A145890 *In re Aaron J.*

27