Filed 12/18/23  In re I.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.M. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E081184 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ2200175) |
| v. | OPINION |
| A.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Sean P. Crandell and Michael J. Rushton, Judges.  Affirmed in part, vacated in part, and remanded with directions.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham, and Catherine E. Rupp, Deputy County Counsel for Plaintiff and Respondent.

Defendant and appellant A.M. is the father of the dependent minors I.M. (born March 2021) and E.M. (born November 2022).[1] At a March 2023 hearing, which was both a jurisdiction and disposition hearing for E.M. and a six-month review hearing for I.M., the juvenile court declined A.M.'s request that the children be placed in his care under a family maintenance plan. Also, in April 2023, the court granted the county welfare department's petition under Welfare and Institutions Code[2] section 388 to delay implementing a previously ordered plan to step up A.M.'s visitation in anticipation of eventual placement. A.M. argues these orders were abuses of discretion. We find no abuse of discretion because ample evidence shows the juvenile court's decisions were reasonable.

A.M. also argues the department failed to comply with California law implementing the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) by failing to ask available extended family members if the children have Indian ancestry.[3] The department concedes ICWA error, though it disagrees with father as to which

---

[1] More precisely, he is both the biological father and presumed father of E.M., and he is the presumed father but not the biological father of I.M.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

[3] "Because ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

relatives should have been questioned. It argues reversal of the jurisdictional or dispositional orders is not required. We agree the department's initial ICWA inquiry error is not reversible due to the stage of this case at the time of appeal. (See *In re Dominick D.* (2022) 82 Cal.App.5th 560, 563, 567 (*Dominick D.*).)

Accordingly, we vacate the juvenile court's finding that ICWA does not apply and remand for compliance with ICWA and related California law, but we otherwise affirm.

## I. BACKGROUND

In April 2022, plaintiff and respondent Riverside County Department of Public Social Services (the department) filed a dependency petition alleging I.M., and two older half-siblings, whose cases are not at issue in this appeal, came within section 300, subdivisions (b)(1) (failure to protect) and (g) (no provision for support). As to the children's mother, who is not a party here, the petition alleged, among other things, general neglect and substance abuse. It alleged I.M.'s father was not a member of the household, his identity was unknown, and he had failed to provide for I.M.'s support. The juvenile court ordered the children detained.

Mother told the department that I.M.'s biological father died before I.M. was born. A.M. is not the biological father of I.M. or his older siblings; he and mother began dating while she was pregnant with I.M. Before the dependency, mother repeatedly left her children in the care of A.M.'s mother, Mrs. M., for extended periods. Indeed, Mrs. M. told the social worker she had been I.M.'s primary caretaker since birth.

Mrs. M. also said A.M. and mother struggled with substance abuse. She said A.M. and mother broke up after mother stabbed him in the back with scissors, but the children were not present then, nor for other domestic violence. One of the older children, however, reported observing domestic violence between mother and A.M.: "He reported [A.M.] was mean to his mother. He explained [A.M.] would hit his mother, throw things at her, and be verbally abusive towards his mother." He also described "an incident . . . where [A.M.] kicked their dog," though he "denied [A.M.] hit him or his siblings."

At the jurisdiction hearing, the court sustained the petition, declared the children dependents, and found "out-of-home placement is necessary."

At first, mother did not do well on her case plan. She was living in a trailer on Mrs. M.'s property, and the department believed she had "potentially resumed" her relationship with A.M. She was pregnant but not receiving prenatal care, and she continued to abuse drugs, specifically amphetamine and methamphetamine. In October 2022, the department recommended terminating her services.

In November 2022, mother gave birth to E.M. A social worker contacted her the next day at the hospital and found A.M. in the room with mother and baby. Mother identified A.M. as E.M.'s father. The social worker spoke with mother and A.M. separately. Mother admitted using methamphetamines during her pregnancy, including as recently as a week earlier. She told the social worker A.M. was aware she had "messed up a few times."

4

When the social worker spoke with A.M., who was living in the trailer on his parent's property, he agreed he was E.M.'s father. He admitted to a history of methamphetamine usage and an April 2022 arrest for possessing that drug. He denied using any other drugs or alcohol. He said he had been "trying to stay sober" because of the baby, and the "last time he used was 3-4 months ago." But he declined the social worker's request that he drug test unless it was court ordered. He at first denied knowing about mother using drugs while pregnant, but, once the social worker relayed mother's statements, he admitted he knew she was. He explained he "tried to discourage" mother from using, but he "does not have control over her or the ability to tell her what to do." As he and mother were not "currently in a relationship," he "did not see her often enough to know what she was doing."

In a dependency petition filed in November 2022, the department alleged E.M. came within section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of a sibling). The petition alleged as its basis the "unresolved" substance abuse history of both mother and father, father's refusal to submit voluntarily to drug testing, and father's "criminal history for drug related charges," including most recently the April 2022 arrest for possession of methamphetamine. The juvenile court declared A.M. to be E.M.'s presumed father, ordered E.M. detained from both parents, and ordered supervised visitation. The court authorized the department to place E.M. in A.M.'s care "upon a negative drug test and suitable home evaluation."

5

On December 15, 2022, A.M. tested positive for alcohol in an on-demand test. A week later, though, and repeatedly over the next months, he tested negative for all substances, including on hair follicle tests.

In February 2023, A.M. filed a motion asking to be found the presumed father of I.M. The motion, supported by A.M.'s declaration, argued he had been "present at [I.M.'s birth,] welcomed him into his home, changed his diapers, held [him] out as his own to other family members, and provided him with food, shelter, clothing, and love." The court granted the motion. (Once the motion was granted, A.M. had been designated a father to both I.M. and E.M., so we will refer to him as father for the rest of this opinion. For the same reason, we will refer to Mrs. M. (paternal grandmother) and other paternal relatives by their familial relationships to the children.)

Also in February 2023, the department began evaluating father's home for possible placement. By that time, mother had moved from the trailer on paternal grandmother's property to an in-patient sober living program. Because mother had been doing much better since E.M.'s birth, the department's recommendation was for mother and father to receive reunification services as to both children.[4]

On February 15, father told the social worker he had moved out of the trailer and into the main home because the trailer was "too cold." On a February 21 visit, the social worker found the main house "clean and appropriate." The social worker asked to see the

_____

[4] The department's recommendation for the two older half-siblings was to terminate the dependency and grant sole physical and joint legal custody to their father, who lives out of state. The juvenile court accepted that recommendation.

6

trailer too, but father said he had returned the keys to paternal grandmother, who was not home. Father allowed the social worker to look through a window of the trailer, and she noticed that a television was on, causing her to suspect someone may have been living there. Also, father "shared that he had documents relevant to his case plan services that [were] locked in the trailer." Since paternal grandmother was not home, she "could not verify that the father was not currently residing in the trailer and had permission to reside in the main home with the children."

The social worker inspected father's residence again on March 1, 2023. Mother was also there. Again, the main home was "clean" and "appropriate." Father had the keys to the trailer this time, and the social worker observed it was "dark, cold, damp and emitted a strong, foul odor." The door to the bathroom "had a fist mark as if someone had punched it" and "[s]everal walls had holes in them." Father attributed the damage to "relatives" who had occupied the trailer and who were "recently asked to leave." Father said they "were in the process of cleaning out the trailer to prepare for it to be rented to a tenant," and they were "planning to repair it and . . . would be remodeling." Father said he was starting a new job and had arranged for paternal grandmother to watch the children while he worked.

Along with inspecting the property, the social worker also discussed the case with mother and father, who "confirmed their intentions to continue their relationship" and for mother to "eventually come back" to live with father and the children. But father

7

"confirmed that he would not allow the mother to return home unless the Court approved it."

On March 6, 2023, the juvenile court conducted a hearing that combined I.M.'s contested six-month review and E.M.'s jurisdiction and disposition hearings. Paternal grandmother testified father had his own room in her house, and the house was ready for the children to move in. She said she would be home to help care for the children, and agreed to report to the department if father began using drugs or alcohol again. She claimed, however, to have been unaware of what illegal drugs were, let alone that father or mother had been using them, until after the children were removed. She knew father had an arrest history because she picked him up from jail once, and he told her he "was caught with something," but he did not tell her "what he was caught with." Paternal grandmother also testified her husband and adult daughter also lived in the home. When asked whether her husband has a police record or arrest history, paternal grandmother responded, "Well, he doesn't have any arrest. He had an arrest, but that's all fixed now."

Father argued I.M. and E.M. should be placed in his care on a family maintenance plan, as the department had not proven the children needed to be removed from him. He emphasized he had proven his continued sobriety through a clean hair follicle test, and he had been participating in a substance abuse program on his own initiative, even though a case plan had not yet been ordered. The house was outfitted with all the material things needed for the children, and paternal grandmother was available to care for the children when father was at work.

8

The department acknowledged father's substance abuse progress, including about six months since last using methamphetamines. It nevertheless opposed father's request that I.M. and E.M. be placed with him, emphasizing his history of failing to protect the children from mother's mental health and substance abuse issues, his initial reluctance to participate in drug testing, and his December 2022 positive test for alcohol. Minor's counsel indicated she "would not be opposed to family maintenance upon the home being completely vetted and approved by the Department." Father's counsel added: "It's fine for the Department to go ahead and vet the other adults that live in the household."

The juvenile court ordered that I.M. continue as a dependent child and that he remain out of both parents' physical custody. It sustained the allegations of E.M.'s dependency petition, declared him a dependent, and ordered him removed from both parents. It ordered mother and father receive reunification services as to both children. As to both children, the court ordered father have unsupervised visitation in his home, starting at a minimum of eight hours per week, with the express conditions that father must be present for the entirety of those visits, and mother must not be present. The court said the visits could occur on Saturday or Sunday ("a minimum of two times a week, four hours, on days that he can be there, whether that's a Saturday or Sunday. He can do it one day for eight hours, if you would like"). This plan was reflected in the court's minute orders, not quite precisely, as requiring that the visitation take place on Saturday or Sunday. The court gave the department three weeks to "fully vet the household," meaning background checks of all the adults in the home. Then, "once everybody in the

9

house passes," father was to have two consecutive unsupervised long weekend visits. The court expected that once those long weekend visits were completed, the children could be placed in the home with father.

Arranging visitation turned out to be difficult. On Thursday, March 9, 2023, and again on March 10 and 13, father behaved poorly toward the social worker and the children's caregiver in a series of telephone conversations, voicemails, and text messages. The caregiver had proposed transporting the children for eight-hour visits on Mondays. But Mondays were unacceptable to father, who was "adamant that the judge said that he could have the visits on the weekends." The social worker asked father to contact the caregiver directly to "solidify the plans" because she would be out of the office the next day. When father did so on March 10, he rejected the caregiver's offer of a Sunday visit "because he had church" and demanded the visit happen on Saturday. The caregiver characterized father as "'aggressive and rude' with her while trying to compromise."

Father's demeanor toward the social worker was no better. Father was "very irate and demanding that the Department carry out his demands regardless of the caregiver's schedule." He repeatedly shouted at and talked over the social worker during phone calls, and left a number of "hostile" and "angry" voicemails. As a result of father's unwillingness to compromise, as well as a series of snags in his attempts to provide proof of car insurance so that he or paternal grandmother could transport the children, father did not visit at all with the children that weekend. In the social worker's opinion, the father's "disproportion[ate] rage" about the scheduling of visits was "concerning." She

opined that his "initial frustrations" were "common," but his "sustained anger was inappropriate and an indicator of deeper issues."

On March 15, 2023, father accepted an offer for an 8-hour visit on Sunday, March 19. Later on March 15, father texted some documentation regarding his case plan to the social worker, and also apologized for being "really upset on Monday." The next day, the social worker accepted father's apology, and they had an exchange of text messages that was more civil. Father continued, however, to minimize and justify his previous behavior.

The vetting of the other members of father's household could not be completed as quickly as the court had contemplated. A background check revealed "paternal grandmother . . . had four past child welfare referrals from Orange County from 1992-1996," and the available information about those referrals was "limited." The social worker and her supervisor agreed "more information was needed."

On March 27, 2023, the caregiver told the social worker I.M. was hitting mother during visits and exhibiting "sexualized behaviors" with stuffed animals. The caregiver thought this could indicate I.M. had witnessed "some type of sexual behavior," possibly between parents, though the social worker noted I.M. "cannot yet engage in conversational communication so it is unclear if the behavior is from a stress response or if he was witness to sexual behaviors." I.M. had exhibited similar behaviors at the beginning of the dependency but they had abated. Since beginning visitation with father, however, the behaviors had reemerged.

In April 2023, the department filed a section 388 petition requesting a change to the visitation orders. The department asked the court to delay implementing the plan to step up father's visitation, stating "[i]t would be appropriate for the father to continue weekly unsupervised visits with the children, but not for extended weekend visits or placement to occur until the father has a psychological evaluation [and] enroll[s] in anger management and individual counseling." As new information justifying the change, the petition described father's extended "outburst of anger" with the caregiver and the social worker on March 9, 10, and 13, which the social worker found "disproportionate to the situation" and "very concerning." It also said the caregiver had noticed I.M. "has returned from the visitation with the father with increased aggression and sexualized behaviors in the form of fondling his own genitals and pressing his genitals against stuffed animals." The petition also cited an incident from February 2023, when father had a "verbal altercation with staff" at a drug test collection cite. Father "became upset with staff when he was told to wait as he had told staff that he needed to go to the bathroom urgently." When escorted to the restroom by a doctor, however, he "did not produce the sample." When he returned to try again, he was "too late" in the day, and he became "'disruptive with staff' prior to leaving the testing facility."

The juvenile court held a hearing on the petition. County counsel offered to have the social worker say more about her interactions with father. Father's counsel said he would "like to hear from the social worker before I make my comments." The social worker confirmed the concern was father's "pattern of behavior" and not any one thing

12

he said that was "particularly threatening." Father "was essentially angry for about five days." She described how she often "couldn't get a word in edgewise" when speaking to him on the telephone, while father was "shouting" at her, not simply expressing frustration in a conversation but "just lashing out" at her. She said she was concerned this was part of a "pattern of behavior" based on what one of the older children reported about father's "propensity to anger" and the incident from February 2023 where drug test collection staff "felt very threatened as well."

Father blamed the events of March 9, 10, and 13 on the social worker. "This would have never happened if [the social worker] would have actually set up the meeting, you know. Like it's her job to actually say, 'Okay. You're going to have this day with the kids, because the caretaker can't do it – can't come make your time at this time or at this date.' She didn't do that. She failed to do her job by providing that. She just basically said, 'Okay. You—you and the caregiver handle it. You guys handle it. I'm off on Friday."

The court granted the department's petition and adopted its recommendations. The court ordered continued unsupervised weekly visits, with authorization for the department "to resume the step-up schedule" when "appropriate." It ordered father to submit to a psychological evaluation and participate in an anger management program, as well as conjoint counseling with mother. It ordered the department to provide father make-up visitation for two visits that had been missed.

13

## II. DISCUSSION

### A. *E.M.'s Disposition Hearing*

Father argues the evidence was insufficient to support removing E.M. from father at his disposition hearing. We are not persuaded.

"To remove a child from parental custody, the court must make one of five specified findings by clear and convincing evidence." (*In re V.L.* (2020) 54 Cal.App.5th 147, 154; see § 361, subd. (c).) "One ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child." (*In re V.L.*, at p. 154; see § 361, subd. (c)(1).) "'"Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.'" (*In re V.L.*, at p. 154.) "Actual harm to a child is not necessary before a child can be removed. 'Reasonable apprehension stands as an accepted basis for the exercise of state power.'" (*Ibid.*)

"A juvenile court's removal order at a disposition hearing will be affirmed on appeal if it is supported by substantial evidence. (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) "'Evidence sufficient to support the [juvenile] court's finding must be reasonable in nature, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case.'" (*Ibid.*) "We consider 'the evidence in the light most favorable to respondent, giving respondent the benefit of every

14

reasonable inference and resolving all conflicts in support of the [challenged order].'" (*Ibid.*) "'[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands . . . . [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.'" (*Id.* at p. 155, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

Substantial evidence supports E.M.'s removal from father. By his own admission, father had a history of substance abuse, particularly of methamphetamines, and related criminal convictions. In November 2022, he claimed he last used methamphetamines three or four months earlier. He declined, however, to support that claim by voluntary testing. Moreover, once testing was ordered by the court, although father had denied using alcohol or drugs other than methamphetamines, on December 15, 2022, he tested positive for alcohol. Thus, although he passed subsequent drug tests, as of the March 2023 disposition hearing, he only had about three months of demonstrated sobriety. Although that is a commendable start, it is not a long time. (See, e.g., *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."].)

Additionally, although father initially told the social worker he was unaware of mother's continued drug use while pregnant with E.M., he was in fact aware. It is

15

reasonable to view this as a continuation of the pattern, beginning even before I.M. was born, of father failing to protect the children from mother's drug use.

Also, there was evidence the parents had engaged in domestic violence with each other, including in the presence of the children. According to parental grandmother, the children were not present when mother stabbed father with scissors. One of the older children, however, said he witnessed other incidents of domestic violence between the parents in which father was the aggressor.

The evidence of father's past drug abuse and only recent sobriety, his long-term failure to protect the children from mother's drug abuse, and the domestic violence between mother and father, together provide ample support for the juvenile court's finding there was a substantial risk of injury to E.M.'s physical health, safety, protection or emotional well-being if he was returned to father's care.

Father points to parts of the record that arguably support a different finding, but he fails to account for the standard of review. Evidence supporting one conclusion does not negate substantial evidence of a contrary conclusion. (See *In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) For similar reasons, we do not find *In re E.E.* (2020) 49 Cal.App.5th 195 "instructive," as father proposes. The differences between this case and the facts of *In re E.E.* show, at most, that this case was a closer call, with more evidence arguably tending to support returning E.M. to father's care. That is not enough to show an abuse of discretion. Because the record, viewed in the required, deferential light,

16

contains substantial evidence in support of the juvenile court's decision to remove E.M. from father, the juvenile court's finding may not be disturbed.

Father also argues the juvenile court "failed to consider a number of orders it could have made to further protect [E.M.'s] safety in father's care." As father notes, the juvenile court was "statutorily required to determine 'whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home' and to 'shall state the facts on which the decision to remove the minor is based.'" (*In re L.O.* (2021) 67 Cal.App.5th 227, 246-247, quoting § 361, subd. (e).) It also was required to "consider 'as a reasonable means to protect the minor . . . . [¶] (A) The option of removing an offending parent . . . from the home.'" (*In re L.O.*, at p. 247, quoting § 361, subd. (c)(1)[5].)

We agree with father that the juvenile court's factual findings were deficient. In ordering removal, it did not make any express findings about reasonable means of preventing or eliminating the need for removal. The court adopted the department's recommended finding that "out-of-home placement" was "necessary." That conclusory finding, however, "is not a replacement for a statement of the facts supporting the court's decision to remove a child from a parent's custody." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1067.)

---

[5] The court is also required to consider "(B) Allowing a nonoffending parent . . . to retain physical custody as long as that parent . . . presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (C)(1).) For the reasons discussed, however, father is not a nonoffending parent.

Nevertheless, "'cases involving a court's obligation to make findings regarding a minor's change of custody or commitment have held the failure to do so will be deemed harmless where "it is not reasonably probable such finding, if made, would have been in favor of continued parental custody."'" (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 247.) This is because a removal order "'is subject to the constitutional mandate that no judgment shall be set aside "unless, after an examination of the entire cause, including the evidence, the [appellate] court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."'" (*In re D.P.*, *supra*, 44 Cal.App.5th at p. 1068.) "Under this mandate, a 'miscarriage of justice' will be declared only when the appellate court, after examining the entire case, is of the opinion that '"it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."'" (*Ibid.*)

Here, although the juvenile court did not make the required express statement of its factual findings while making its removal order, its reasoning is discernible from the record. During the disposition hearing, the court offered its tentative view of the evidence as follows: "My take is [paternal grandmother], as nice as she is, kind of has her head in the ground, doesn't seem to have a clue about anybody using drugs, what drugs are, what drugs do to people, doesn't know why her son was repeatedly arrested. It sounds like [father] was coexisting with [mother] when she was having all of her substance abuse problems that had all the other kids removed, which is suggestive of him having a similar issue based on his arrest history." The court said it did not "have a lot of

18

information related to remedial efforts." The court also said "any home assessment would need to include assessing the other adults in the home and determining whether it's a safe and appropriate place for the children." It then allowed the parties to present further arguments, before making its rulings.

The court's rulings included visitation orders providing for father to have unsupervised visits with E.M. and I.M., followed by unsupervised long weekend visits once the other members of the household had been fully vetted, with the expectation that after two weekend visits E.M. and I.M. would be placed with father. The court reasoned this step-up plan would give father "time to develop a relationship with the kids, cut your teeth as a parent where you are a primary caregiver." The court emphasized that father must maintain his sobriety and expected the department to "regularly test" father.

This record shows the juvenile court was not quite persuaded father's recent sobriety, combined with his new living arrangement in the main house on his parents' property, was sufficient to prevent or eliminate the need to remove E.M. from father. Although father's new living situation seemed appropriate in terms of the physical space and the material things needed to care for children, the other people who lived in the home had not yet been vetted, and father's current ability to protect the children as primary caregiver was, at best, untested. Nevertheless, the juvenile court was prepared to move quickly to return E.M. to father's care if he could maintain his sobriety and complete increasingly extended, unsupervised visits with the children, and if the department could verify the other people in the home were safe.

This unusually detailed record of the court's reasoning shows the juvenile court carefully considered what reasonable steps could be taken to prevent or eliminate the need for removal, even though it did not repeat its tentative findings when making its removal order. It decided those steps had not yet been completed as of the disposition hearing, such that removal could be avoided altogether, but it fashioned its disposition orders to try to have them completed in short order. We find no reasonable probability the court would have reached a different decision if it had expressly "reflected upon and stated the facts as required under section 361" in announcing its decision to remove E.M. from father. (*In re D.P.*, *supra*, 44 Cal.App.5th at p. 1069.) We therefore find the court's failure to make the mandated removal findings harmless error.

B. *I.M. Six-Month Review Hearing*

Father argues there is insufficient evidence to support the juvenile court's order at I.M.'s six-month review hearing that he be continued in out-of-home care instead of placed with father on a family maintenance plan. Again, we are not persuaded.

At the six-month review hearing, "the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) We apply the deferential substantial evidence test in reviewing the juvenile court's decision refusing to place the child with father. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252.)

Our reasoning upholding the juvenile court's decision to remove E.M. from father applies equally well here. There was ample evidence to support the conclusion placing I.M. with father would still present a substantial risk of detriment to the child's well-being, notwithstanding recent improvements such as father's sobriety. Father's arguments demonstrate, at most, that the juvenile court arguably could have made a different decision, not that it abused its discretion in making the decision it made.

C. *The Department's Section 388 Petition*

Father argues the juvenile court should have denied the department's section 388 petition because the department "failed to establish new evidence and/or change of circumstances and failed to establish that the requested relief was in the best interest of the children." We find no abuse of discretion.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child." (*In re A.A.* (2012) 203 Cal.App.4th 597, 611.) "The [petitioner] bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child." (*Id.* at pp. 611-612.)

The juvenile court may consider the entire factual and procedural history of the case to determine whether the [petitioner] has shown changed circumstances. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) "The change in circumstances supporting a section 388 petition must be material." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) It

21

must also "relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re S.R.* (2009) 173 Cal.App.4th 864, 870.)

We review the juvenile court's determination for abuse of discretion, reversing only where a decision is beyond reason. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460.)

We find nothing unreasonable about the juvenile court's decision to pause the previous plan to step up father's visitation in anticipation of placement. Father's recent behavior, as described in the department's reports, was good cause for concern. Some level of frustration with the inconvenience of being unable to arrange visitation on his preferred schedule, or other such routine logistical difficulties, is understandable. A multiple day tantrum expressed through repeated outbursts of verbally abusive behavior is a warning sign. And even at the hearing on the department's section 388 hearing, father took no responsibility for his own actions, instead blaming the social worker for their conflict. Particularly given the evidence father previously engaged in domestic violence—not only verbal abuse but also physical violence—it was appropriate for the juvenile court to conclude that a psychological examination and additional services were required before it would be safe to return the children to father's custody.

Father challenges the juvenile court's decision to "solicit[] comments" from the social worker, emphasizing that she was not sworn in as a witness. Father's counsel, however, expressly encouraged the court to allow the social worker to comment, saying he would "like to hear from the social worker before I make my comments." Father's

counsel did interpose an objection to the *content* of the social worker's comments, arguing "[t]his is not new information" that is "proper" to consider in a hearing on a section 388 petition. Counsel made no specific objection, however, to the informal procedure the court used in soliciting the social worker's comments, so father forfeited any objection to that procedure. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on another ground as stated in *In re Aaron J.* (2018) 22 Cal.App.5th 1038, 1050.)

Moreover, the social worker's comments largely echoed what was already stated in her written report of father's behavior, which were signed under penalty of perjury and which were without question properly considered. The only arguably new aspect was the social worker's confirmation father did not make any single statement that, standing alone, "was particularly threatening," even though she perceived a concerning "pattern of behavior." That confirmation only redounded to father's benefit; we find it improbable the juvenile court would have authorized continued unsupervised visitation of any duration if father had made specific threats. Thus, any error in the juvenile court considering the social worker's unsworn comments was harmless under any standard.

Father also argues his February 2023 verbal altercation with staff at the drug test collection site and I.M.'s concerning behaviors did not constitute new information, properly considered as a reason to change the visitation orders. Not so. The February 2023 incident took place before the court made the visitation orders, but was not included in the information presented to the court before the hearing on March 6, 2023. Also, that

23

event at least arguably took on additional significance, as part of an ongoing pattern of behavior rather than an aberration, after later events.

As to I.M.'s behavior, the social worker reported that he had "returned from visitations with the father exhibiting sexualized behaviors that he had had when he initially entered foster care." Recent reemergence of past behavior that had previously abated is new information, appropriately considered in a hearing on a section 388 petition. It seems the concerning behaviors took place during visits with mother, as well as at the caretaker's home. The social worker's point, though, was that the child's behavior deteriorated in the weeks immediately after visits with father began. That is new information, showing a concerning correlation, even if causation cannot be established.

We are not persuaded that the juvenile court erred in considering the department's allegation about I.M.'s behavior; even if its significance was subject to disagreement, it was new information, properly considered in the context of a section 388 petition. But in any case, the court's focus in making its ruling seems to have been *father's* behavior. At no point does the court indicate that I.M.'s behavior, which may or may not be related to starting visits with father, played any role in its decision.

Finally, father argues his "upset due to the failure of DPSS to ensure that he was afforded the visitation ordered by the juvenile court," even if it were "disproportionate," is not reasonably viewed as "establish[ing] that the requested change was in the minors' best interests." We disagree. It was appropriate for the juvenile court to view recent

24

incidents in the context of the entire factual and procedural history of the case. (*In re Justice P.*, *supra*, 123 Cal.App.4th at p. 189.) Father's outbursts toward the social worker and the children's caretaker are reasonably interpreted as showing his previous episodes of verbally abusive behavior were not solely artifacts of substance abuse, fully ameliorated by his recent sobriety. The juvenile court was well justified in concluding on that basis the children's interests would be best served by requiring father to undergo a psychological evaluation and complete anger management training before further increasing his visitation or placing the children in his care.

We conclude father has not demonstrated any abuse of discretion in the juvenile court's order granting the department's section 388 petition.

D. *ICWA*

Father argues the department did not comply with its duty of initial inquiry under ICWA. The department concedes it has not yet completed its initial inquiry, but argues that reversal of the jurisdictional or dispositional orders is nevertheless unwarranted. We agree with the department.

1. *Additional background*

Mother's statements about her own ancestry have been inconsistent. Several times, she flatly denied any Indian ancestry. Early in the dependency, however, she told a social worker she "may have Native American ancestry" but "denied being affiliated with a tribe." In an April 2022 interview, she "clarified this would be through her maternal side of the family." She identified several maternal family members—a

25

maternal great aunt and maternal great grandmother—as possible sources of information, but "did not provide contact information for these individuals." The department had contact with several other maternal family members—specifically, the maternal grandmother and two maternal aunts—but failed to ask them whether I.M. and E.M. may have Indian ancestry.

Father repeatedly denied having any Indian ancestry. Paternal grandmother also said father had no Indian ancestry. There is, however, no record the paternal aunt who lived with paternal grandmother was ever asked about Indian ancestry.

2. *Analysis*

Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.* (2020) 55 Cal.App.5th 558, 566.) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.*, at p. 566.) Only the first of the three phases is relevant here.

The department generally has an initial duty to inquire into whether a child is an Indian child. (*In re J.S.* (2021) 62 Cal.App.5th 678, 686 (*J.S.*); see § 224.2, subd. (b).) "'The child welfare department's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is

26

domiciled.""" (*J.S.*, at p. 686; see § 224.2, subd. (b).) Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, sisters, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

The department concedes it erred by failing to ask the maternal grandmother and two maternal aunts about possible Indian ancestry. We accept that concession.[6] The department makes no such concession, however, with respect to the paternal aunt.

Regardless, "ICWA inquiry and notice errors do not warrant reversal of the juvenile court's jurisdictional or dispositional findings and orders other than the ICWA finding itself." (*Dominick D.*, *supra*, 82 Cal.App.5th at pp. 567, 563.) Because the jurisdictional and dispositional findings must be affirmed, and this dependency case will be ongoing, with an 'affirmative and continuing" duty to comply with ICWA under section 224.2, subdivision (a), we will simply remand with directions to the juvenile court and department to do so through the end of the case. Compliance would stave off an ICWA error that would be reversible at that time.

We expect the department to fix its conceded errors. We will leave for the juvenile court to consider in the first instance, if necessary, the parties' disagreement about whether the paternal aunt remains readily available and whether her answers to

_____

[6] The split of authority currently under consideration by our Supreme Court in *In re Ja.O.* (2023) 91 Cal.App.5th 672, review granted July 26, 2023, S280572, as to whether the initial duty to inquire includes extended family members in all cases, or only when the child is removed from parental care without a warrant, was not raised in briefing by any party. Both I.M. and E.M. were removed from parental care after the department sought and obtained protective custody warrants. Nevertheless, since the department has chosen not to raise the point, we will not discuss it further.

27

being asked about possible Indian ancestry are "likely to bear meaningfully upon whether the child is an Indian child," given the current state of the department's other inquiries. (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Of course, if it is possible to do so, simply asking the paternal aunt the relevant questions and documenting her answers may obviate the need for any court to consider that dispute.

### III. DISPOSITION

We vacate the finding that ICWA does not apply. We direct the juvenile court to order the department to comply with its inquiry and (if applicable) notice obligations under ICWA and related California law. In all other respects, we affirm the dispositional findings and orders, as well as the order granting the department's section 388 motion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL

J.

We concur:

MILLER

Acting P. J.

FIELDS

J.

28